TONGUE & YELLOWSTONE RIVER IRR. DIST. et al. v. JORDAN.*

(Circuit Court of Appeals, Ninth Circuit. February 24, 1920.)

No. 3323.

1. WATERS AND WATER COURSES ☞228½, New, vol. 10A Key-No. Series— WHERE IRRIGATION SYSTEM WAS SOLD FOR BONDS REQUIRING VALIDATION BY COURT, DATE OF SALE WAS DATE OF DECREE OR VALIDATION.

Where a contract for the sale of an irrigation system to an irrigation district, providing for conveyance and payment on or before February 25, 1915, also gave the district an option to pay in its bonds requiring approval and validation by the court, which was not obtained until June 30, 1915, the date of the decree of validation was properly regarded as the true date of the sale.

2. WATERS AND WATER COURSES ☞228½, New, vol. 10A Key-No. Series—MAKING OF REPAIRS TO IRRIGATION SYSTEM CONSTRUED AS CONDITIONS SUBSEQUENT AND NOT CONDITIONS PRECEDENT TO SALE OF SYSTEM.

Where a contract for the sale of an irrigation system required the seller to make specified repairs and enlargements, and provided that if they were not completed on or before May 15th the buyer might retain a sufficient amount of the purchase price until the work was completed, and that this might be done after the close of the irrigating season, the making of the repairs and enlargements were conditions subsequent, and not conditions precedent, to the taking effect of the sale and purchase.

3. WATERS AND WATER COURSES ☞228½, New, vol. 10A Key-No. Series—CONTRACT OF SALE OF IRRIGATION SYSTEM CONSTRUED AS NOT REQUIRING ENLARGEMENT TO CARRY QUANTITY OF WATER SOLD.

A contract of sale of an irrigation system, together with a water right of 7,500 miners' inches of water, which required the seller to make specified repairs and enlargements, did not require such an enlargement as would permit 7,500 miners' inches of water to pass through the system, especially where a lease from the seller to the buyer required the system to be placed in such repair that 4,000 inches could be distributed.

4. WATERS AND WATER COURSES ☞228½, New, vol. 10A Key-No. Series—UNDER CONTRACT FOR SALE OF IRRIGATION SYSTEM PAYABLE IN BONDS, SELLER ENTITLED TO INTEREST FROM DATE OF SALE.

Where a contract of sale of an irrigation system contained, an option, which the buyer exercised, to pay the purchase price in its own bonds at par value and accrued interest, and there was a delay in completing the contract, the seller was entitled to interest from the date the sale became effective, but could not be permitted to retain any of the net revenue received by him after that time.

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit by William B. Jordan against the Tongue & Yellowstone River Irrigation District and others. From the decree, defendants appeal.. Affirmed.

Loud & Leavitt, of Miles City, Mont., and C. A. Spaulding, of Helena, Mont., for appellants.

Sharpless Walker, of Miles City, Mont., and O'Brien, Young, Stone & Horn, of St. Paul, Minn., for appellee.

Before ROSS, MORROW, and HUNT, Circuit Judges.

ROSS, Circuit Judge. This suit was brought in 1918 for the rescission of a contract entered into November 4, 1914, by which the

present appellee (complainant below) agreed to sell to the appellant irrigation district a certain dam situated in the Tongue river dam site, canal, and irrigation system, and right of way for the same, together with a water right of 7,500 miners' inches of the waters of the river, then owned by him, for the sum of $195,000, payable in cash, or, at the option of the district, in its bonds in that amount. The contract provided, among other things, that upon the payment of the purchase price to Jordan, or the delivery to him of the 6 per cent. coupon bonds of the district specified and provided for in the contract, on or before February 25, 1915, Jordan would convey the property to the district by proper deed or deeds, and it also contained, among others, the following provisions and conditions:

"It is hereby mutually understood and agreed that at this time the dam, headgates, flumes, and also the canal are not in a good state of repair, and it is therefore covenanted and agreed by the party of the first part [Jordan] to and with the party of the second part [the irrigation district] that the said dam shall be placed in a good state of repair by the party of the first part by facing the front thereof with new five-inch plank facing, and the replacing upon said dam of any and all rails that have been displaced or loosened therefrom, and shall make any other minor repairs, so as to place the dam in a good state of repair. It is further understood and agreed by and between the parties hereto that the party of the first part will complete the reinforced concrete wall and will complete the building of the reinforced concrete headgates in a good, substantial, and workmanlike manner, and that he will in addition thereto clean out and widen the canal in division I of said irrigation district, so that the said canal shall be 16 feet wide at the bottom at the upper end of said division, with a slope of one to one, and which shall gradually decrease in width through said division, so as to be 14 feet in width at the commencement of division II"

—with further provisions regarding the cleaning out and width of the canal, and concerning the height of the banks on its lower side. The contract further provided that all flumes on the canal should be placed in a good state of repair, and where beyond repair should be replaced with new flumes of sufficient carrying capacity to carry all of the water required at the point in the canal where such structures were located. It also provided that the party of the first part should cut and remove all trees and brush which would otherwise interfere with the flow of the waters in the canal, and that in the event there were "any high places" in the canal, which interfered with the flow of the water, such high places should be removed by the party of the first part; "it being the intention that the party of the first part will turn over to the party of the second part the dam, canal, and all structures in a first-class state of repair." The contract further provided that, where the siphon across Pumpkin creek was exposed to ice and drift, the siphon should be protected therefrom by placing a layer of concrete seven inches in thickness upon the top thereof, and that the repairs provided for should be prosecuted with such due diligence as the physical conditions permitted, and that in the event the repair work provided for could not be completed on or before May 15, 1915, the party of the second part might retain a sufficient amount of the purchase price, or a sufficient number of the bonds,

necessary to complete the work until such work should be completed, which the contract provided might be completed after the close of the irrigating season of 1915, stated to be September 1, 1915, and before the commencement of the irrigating season of 1916 on May 15, 1916.

The contract also contained provisions regarding the ratification of the purchase of the property by the owners of the lands within the district, and the issuance of the bonds of the district in payment of the property, and for the validation of the proceedings by a court of the state; that in consideration of the conveyance of the property in a good state of repair, as therein specified, the district would pay therefor the purchase price in money or in bonds of the district issued in pursuance of the laws of the state; and that in the event such payment be made in bonds the same should be received by the seller at par value and accrued interest at the time of delivery. The contract concluded with the provision that all the repair work provided for and all changes in and about the dam and headgates should be done and performed and finished under the direction and subject to the approval of the board of commissioners of the district, which approval should be reported to the seller.

The bill alleged in substance that upon the execution of the contract the board of commissioners of the district by proper resolution authorized and directed the issuance of the bonds thereof in question, for the purpose of paying for the property, fixing the date thereof as of January 1, 1915, and also fixing the numbers, denominations, and maturity thereof, and the rate of interest thereon, and directing the levy of a special tax as provided by the Montana law on all of the lands in the district sufficient in amount to pay both the principal and interest of the bonds, and forthwith caused the commencement of proceedings in the proper court of the state for the ratification and confirmation of all of the proceedings, resulting in a decree approving and confirming them on June 30, 1915.

The bill alleged that, while the suit for the confirmation of the proceedings was pending and undetermined in the state court, the complainant leased the property to the district for the irrigating season of 1915 at a certain rental; the lease reciting that it was made because the lessor was unable by reason of ill health to undertake the management of the system during that time. It contained provisions to the effect that the lessor would accept the promissory notes of the lessees and landowners in payment of the rental of water furnished during the irrigation season of 1915, and that the lessor should immediately cause the canal, headgates, flumes, and other structures to be placed in such a state of repair that 4,000 or more miners' inches of water could be diverted from the river and distributed through the canal to the landowners of the district for irrigation purposes before May 10, 1915, unless the work should be unavoidably delayed by bad weather, in which event the repairs should be completed at the earliest possible date. The lease was extended to and made to embrace the operations of the system during the irrigating season of 1916, and the case shows that during the season of 1917 it was operated by a receiver appointed by a court of the state in which the

property is situate, in a suit brought therein for that purpose by the irrigation district and others.

The bill further alleged that immediately upon the confirmation of the contract and proposed bond issue the district through its commissioners issued the bonds in question in accordance with the law of the state, whereupon the complainant demanded the acceptance of the conveyance of the property he had theretofore executed and the delivery to him in payment therefor of the bonds in question, less such amount thereof as the commissioners should deem necessary to withhold as security for the completion of the repairs of the irrigation system, as specified in the contract, all of which the district refused to do; that while engaged in making the repairs required of him by the contract the complainant frequently requested and demanded that the district supervise such work, so that as each part of it was completed in accordance with the contract the same might be approved, all of which the district refused, with the result that large parts of the work which had been done in accordance with the terms of the contract were left exposed to the wear and tear of use and injuries from storms and ice, whereupon the district refused to accept such work and demanded that it be done over again; that the complainant exercised every effort to complete the repairs in accordance with the requirements of the contract, always having in his employ for that purpose a competent engineer to direct and supervise the work, and that the complainant finished all of such repairs as required by the contract, with the exception of a certain specified flume, for which the engineer was unable to procure the necessary material, which delay was intended and expected to be overcome before the commncement of the next irrigating season, the cost of completing which, while negligible, the complainant conceded the right of the district to retain a sufficient sum from the purchase price to cover such expense.

The answer of the district and its commissioners also set up the contract between the parties, alleged a failure of performance thereof on the part of the complainant, and the readiness of the district to perform, and by cross-bill asked that specific performance of the contract be decreed, and while specifically denying various of the allegations of the bill, expressly admitted the issuance of the bonds, the possession of them by the defendants, and further admitted:

"That they have informed plaintiff that before they will deliver the bonds of said district to the plaintiff in payment of said water right, irrigation plant, etc., they will remove and detach from said bonds the coupons representing all interest up to the time of delivery. Defendants admit that the plaintiff has prior to the bringing of this action demanded a cancellation or rescission of said contract of November 4, 1914, and that the defendants have refused to consent to such cancellation or rescission of said contract."

Upon consideration of the evidence introduced the court held the complainant entitled to a rescission of the contract, and the defendant not entitled to a specific performance thereof, whereupon it is stated by the court the complainant—

"now waives his right to rescind and consents to specific performance with allowance to the defendant to complete repairs or (and) canal excavation. Defendant demands likewise. They disagree in the matter of interest on the bonds and in the amount of allowance."

The parties thus consenting to specific performance, with allowance to the defendant to complete the repairs and excavation, and disagreeing as to the amount of such allowance and as to the interest due on the bonds, it is obvious that it remained for the court to determine those questions from the evidence. The main contention on behalf of the appellants is that the court below modified and changed the contract, and as so modified and changed decreed its specific performance, which it was without power to do.

[1] In the first place, we do not understand that the court undertook to make a new contract for the parties (which, of course, it could not do), but only to construe it in the light of their acts under and in pursuance of it, as shown by the evidence. It held in effect that the contract provided for the sale and conveyance of the property to the irrigation district, provided that the purchase be ratified by the landowners within the district in conformity to the law of the state, upon the payment of the purchase price in cash or in the bonds of the district equal in amount to the price designated, on or before February 25, 1915, but that inasmuch as the law of the state required such bonds to be approved and validated by decree of a specified court of the state, and as the irrigation district exercised its option to pay in such bonds instead of cash, it held and decreed the true date of the sale provided by the contract to be the date of the decree validating the bonds, to wit, June 30, 1915. In so holding and decreeing we perceive no error.

[2] We are unable to sustain the contentions of the appellants that the provisions of the contract requiring the specified repairs and enlargements of the capacity of the canal by the appellee were conditions precedent to the taking effect of the sale and purchase. That they were conditions subsequent is clearly shown, in our opinion, by the express declaration of the contract that the repairs provided for should be prosecuted with such due diligence as the physical conditions permitted, and that in the event the repair work provided for could not be completed on or before May 15, 1915, the party of the second part (the irrigation district) might retain a sufficient amount of the purchase price, or a sufficient number of the bonds, necessary to complete the work, until such work should be completed, which the contract provided might be after the close of the irrigating season of 1915, stated to be September 1, 1915, and before the commencement of the irrigating season of 1916, on May 15, 1916.

[3] The objection on the part of the appellants that the appellee did not so enlarge the siphon, headgates, or flumes as to permit to pass through them the entire 7,500 miners' inches of the waters of the river, is, we think, well answered by the court below in saying that there is no provision of the contract requiring such an enlargement by the appellee; the court, however, finding that the headgates were by him completed, the flumes repaired, and the siphon overlaid with

concrete as required of him. That the construction so placed upon the contract respecting the headgates, siphon, and flume was in accordance with the understanding of the irrigation district, would seem to be quite clearly shown by that provision of the lease made by the appellee to the district providing that the lessor (Jordan) should immediately cause the canal, headgates, flumes, and other structures to be placed in such a state of repair that 4,000 or more miners' inches of water could be diverted from the river and distributed from the canal to the landowners of the district for irrigation purposes before May 10, 1915, unless the work should be unavoidably delayed by bad weather, in which event the repairs should be completed at the earliest possible date. Yet the witness Shambo, who was chairman of the board of commissioners at the time of the making of the contract, as well as at the time of giving his testimony, declared the position of the defendants to be:

"That the contract requires a canal and headgate and flume and system which will take from the Tongue river 7,500 inches of water, and that the lower canal must be widened and extended, so as to carry that water ready to irrigate 9,704 acres of land, and that until that is done we will do nothing."

The parties having expressly consented to the entry of a decree for the specific performance of the contract, with a sufficient allowance to the defendants with which to complete the repairs and excavations required of the complainant by it, and the evidence showing, and the court finding the fact to be, that $25,000 was a sufficient allowance to be made the defendants for those purposes, in our opinion it was rightly decreed that there be deducted and retained that amount by the defendants from the purchase price of the property. Indeed, the appellants, in assigning the reason for one of the assignments or error, expressly stated:

"That the defendants, under the pleadings and the evidence produced, were entitled to retain bonds in the sum of $25,000, which is equal to the amount which will be required to complete the improvements upon the said plant required by the provisions of said contract."

[4] The real remaining question involved, as we think, is whether the balance of the purchase price should bear interest from the date the sale and purchase became effective, to wit, June 30, 1915. The trial court by its decree held the affirmative of that proposition, by its decree providing, however, for the return by the complainant of all subsequent receipts by him for the water by appropriate deductions from interest coupons prior to the delivery by the appellants of the bonds.

We agree with the court below that the seller was entitled to interest from the time the sale and purchase became effective. If, in exercising its option, the purchaser had elected to pay in cash, instead of bonds, and had refused to pay the money at the time required by the contract, surely the seller would have been as much entitled to judgment for interest from that date on the purchase price as to judgment for the principal sum. Precisely the same rule should apply regarding the bonds in which the purchaser elected to pay, instead of

money, to which may be added that it is expressly provided in the contract that, in the event payment for the property be made in bonds, they should be received by the seller at par value and accrued interest to the time of their delivery.

"Where there is delay in completion of the contract, compensation may be made to one or the other of the parties by means of the rents and profits, and interest on the price. The general rule is to adjust the rights of the parties, so as to give to each as nearly as possible what he would have received, if the contract had been performed according to its terms." 36 Cyc. 754.

It hardly needs to be said that the seller could not be equitably permitted to retain any of the net revenue received by him after the time that the sale and purchase became effective, and at the same time be entitled to interest on the purchase price of the property. We are of the opinion that the court below was right in providing by its decree for the detaching from the bonds required to be delivered in payment for the property a sufficient number of the coupons thereof first maturing to equal the sum of $25,000, for the completion of the repairs and improvements of the plant referred to, and to cover the net sum received by the seller of the property for the use of the water by the landowners subsequent to June 30, 1915.

Finding no error for which the decree should be reversed or modified, it is hereby affirmed.